# Coursin's Appeal.    Gordon's Appeal.

1. The plaintiff and others were the owners of the steamboat Bayard. At a meeting of the owners, neither the plaintiff nor other than owners being present, the boat was set up at "auction" and struck down to Coursin, who paid the purchase-money to the treasurer of the company. That meeting resolved to build a new boat. The plaintiff filed a bill against his fellows for a receiver and an account, and also to restrain them from breaking up the boat; he moved for a preliminary injunction, which was refused. They broke up the Bayard, and put her materials and machinery into a new boat, the Rees. A new company was formed, of which the plaintiff and one of defendants and an owner of the Bayard were not members, and in which there were other members. The Rees was afterwards sold. The plaintiff filed a supplemental bill against *same* defendants, alleging he was part owner, and the acts of defendants made them his trustees. *Held*, that the supplemental bill was defective in including as defendant one not a member of the Rees company, and omitting the others, who had become members after filing the original bill.

2. All the owners of the Bayard but the plaintiff received their shares of the purchase-money. *Held*, the sale did not divest his ownership in the Bayard; he had a right to object to breaking up the Bayard, to insist on a fair sale under the order of a court of equity and an account of the proceeds and the earnings.

3. Plaintiff did not become part owner of the Rees because the materials and machinery of the Bayard were used in her construction.

4. If the materials of one are united to those of another by the labor of the latter, who furnishes the principal materials, the property in the produce is in the latter by the right of accession.

5. If one repairs his vessel with another's materials, the property in the vessel is in the former; if he builds the vessel from the keel with another's materials, the whole belongs to the owner of the materials.

6. The property in a vessel follows the keel.

7. Where there is a confidential relation—as principal and agent—the principal may compel the agent to account for profits he has made of his property.

8. If a partner take the property of the firm and trade with it on his own account, he is answerable to his fellows for the profits.

9. Part owners of a vessel are tenants in common, not partners; the interest of each could be sold only by himself or his agent.

10. If one tenant in common of a chattel sell it, it is an ouster and conversion, and his co-tenant may follow it in the hands of a purchaser, or recover its value from the wrongdoer.

11. The proceeds of sale of a chattel by one tenant in common cannot be followed by a co-tenant into any business into which the wrongdoer may invest them and hold him to account for the profits.

October 5th 1876.    Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeals from the Court of Common Pleas of *Allegheny county:* In equity: Nos. 203 and 237, to October and November Term 1874.

The bill in this case was filed May 15th 1863 by James Gordon against Benjamin Coursin, Frederick Houghton, James Irwin, Frederick Rhoades, David Rhoades, William Whigham, Samuel Clark, Abner Peebles, John E. Shaffer and Joel C. Peebles. The bill was to restrain the defendants from breaking up and dismantling the steamboat Colonel Bayard, and a motion was made for a preliminary injunction, which was refused.

On the 26th of October 1863 the answer was filed. On March 16th 1864 a replication was filed and an examiner appointed. On the 23d of January 1869 a supplemental bill was filed, and same day a rule taken to show cause why it should not be stricken from the record. March 29th the rule was discharged, and on the 29th of May 1869 the answer to the supplemental bill was filed.

The bill and answer did not appear at large on the paper-books. The abstracts as there given are as follows :—

" The original bill recites that James Gordon, complainant, together with defendants (except Joel C. Peebles) were owners of the steamboat Col. Bayard ; the stock of said boat consisting of one hundred and ten shares—twenty-five of which were owned by complainant, each share worth $100, which was long since paid up in full. Complainant was not indebted to the boat nor any of the owners. Said boat is not in debt. Some time last fall, said boat was laid up at Elizabeth, and has not been used since that time until Tuesday, May 12th 1863, when she was run down to Pittsburg by said Joel C. Peebles, Frederick Houghton, Abner Peebles and Benjamin Coursin ; that she now lies at the Monongahela wharf; that said defendants and others have commenced to dismantle and break up said boat, take out the machinery, &c., against complainant's will and protestations ; and are about placing said machinery, &c., in a new boat, now building, in which they allege complainant has no interest.    Complainant has never sold or trans-

ferred in any manner any part of his interest in said boat to anybody. Said boat is worth about $5000. Complainant will suffer greatly, &c., if the same is allowed to be dismantled. There are unpaid claims due said boat. No balance sheet has ever been rendered to complainant by the other owners, although often demanded. The affairs of said boat have never been finally settled. Complainant prays the court to make a decree that the defendants, who are owners, shall state and file an account in full of business of said boat, and pay over to complainant any balance which may be due him ; and that a receiver be appointed to sell said boat and to distribute remaining assets belonging to said owners ; and that defendants be restrained from dismantling and breaking up said boat and from taking out said machinery, &c., from placing the same on a new boat."

"The answer admits ownership of boat as stated in bill ; that it was laid up as stated ; that it was run down the river as stated ; that defendants did to some extent break up said boat, and did remove the machinery to another boat ; but denies that complainant never consented to a sale of said boat ; denies that defendants dismantled said boat and removed the machinery without a right to do so ; denies that complainant demanded balance sheet, or that a settlement or payment of any sum whatever was refused ; denies that he was ever refused any of his rights ; alleges that defendants have always been ready and willing to settle with complainant, and to pay him any sum that may be due him. Defendants know no more of the accounts of said boat than the complainants. The books and accounts are alike accessible to all the owners. Complainant has never asked for an account. He has been paid his dividend regularly along with the other owners. Said boat was built in 1852, and was run for ten years, and until she was worn out and worthless as a steamboat, and it was unanimously agreed by all the owners that she should be sold for the benefit of all parties. At a meeting of the owners regularly held, October 23d 1862, a committee was duly appointed to sell said boat ; committee were unable to obtain any higher bid than $1800, and at another meeting of said owners, held December 13th 1862, it was unanimously agreed that said boat should be put up at auction and sold to highest and best bidder, which was done, and the same was sold to Benjamin Coursin for $1800. That by agreement of the owners in their rules for business concerning said boat and under which she was built and navigated, it was agreed that a majority in interest should govern and control the management and business of said boat, and in the resolution for the sale of said boat at auction, said complainant assented to the same ; that the dividends, earnings, &c., of said boat have at all times been paid to the parties entitled according to the rules of said owners. On May 14th 1863, one day before filing of the bill in this case, said complainant

was paid and received his dividends or share in full of moneys collected on account of said boat up to that date. Defendants say that complainant resided at time of sale in Allegheny City; that said sale was duly advertised in the Pittsburg Gazette, giving time and place of sale, and the same was sold at public auction in accordance with said resolution, at the wharf in Pittsburg, which sale was well known to complainant, and the purchase-money was paid to the treasurer of said owners. Said boat was not broken up nor the machinery removed until some time after said sale, and the purchaser had a right so to do. That a short time before the filing of the bill in this case complainant applied to Benjamin Coursin, who was concerned in the new boat, and asked for an interest therein, which was refused, and then complainant for the first time made some objection to the sale of the old boat."

The supplemental bill set out:—

1. Since filing of the original bill, the defendants broke up and dismantled the steamboat Colonel Bayard, and placed her machinery and apparel, so far as suitable, with the entire interest of the plaintiff therein, in a new steamboat, called the James Rees, and ran her in the same trade in which the said steamboat Colonel Bayard had been used.

2. This was done by resolutions, passed by a majority of the stockholders of the Colonel Bayard, which majority included the above-named defendants.

3. By the action of the defendants, the entire interest of the plaintiff remained and was invested in said new steamboat James Rees.

4. The steamboat James Rees was run in that trade from August 1863 to the fall of 1867, earning a large amount of money, a proportionate share of which belongs to the said plaintiff; when in the fall of 1867, the defendants sold the James Rees for the sum of $20,000, a proportionate share of which belongs to the plaintiff, in addition to his share of the earnings of said boat.

5. The defendants, by their acts in using the Colonel Bayard in constructing the new steamboat James Rees, and running her, retaining plaintiff's money and property therein, became trustees, and bound to account to the plaintiff for the earnings and proceeds of the sale of the James Rees, after deducting expenses and advances made by the defendants, or either of them, if any were made.

6. Plaintiff was entitled to 25-110ths of the earnings and proceeds of sale of the steamboat James Rees.

The prayer was for an account of the earnings and proceeds of sale of that boat, and a decree for payment, &c.

Answer to the supplemental bill:—

1. Respondents did break up and use the steamer Colonel Bayard, as they had a right to do under their purchase of the same

from Benjamin Coursin, who had previously purchased the same from the company owning the Colonel Bayard; Gordon had no interest or ownership in the Bayard when she was dismantled, as the company had long before that sold her to Coursin. A part of the machinery of the Bayard was put into the Rees.

2. A majority of the stockholders passed a resolution to build a new boat; the Rees was not built under that resolution, nor for the old company, nor were the owners of the Rees the same as in the Bayard; Coursin made the contract for the Rees and sold shares to such persons as were willing to take the stock; several of the owners in the Bayard had no stock in the Rees, and several others that never owned in the Bayard were the original stockholders of the Rees.

3. Denied that Gordon had any interest in the Rees; but admitted that the Colonel Bayard was sold with full knowledge of Gordon and his agent, Joel Peebles, and Coursin paid the full amount of the purchase-money into treasury of the Steamer Bayard Company, and the treasurer paid the same to stockholders; the share of Gordon, long before the dismantling of said boat, was standing to his credit on the books of the Colonel Bayard company. No part of the earnings of the Rees, or proceeds of her sale, ever belonged to Gordon.

5. Respondents never retained Gordon's share in the Bayard, or put the same into the Rees, but Coursin paid for Gordon's interest in the Bayard in cash.

6. Respondents believe it to be true that Gordon did not own 25-110 parts in said steamer Bayard, but on the contrary there are but fifteen shares registered in his name; of these shares Joel Peebles, who represented that stock, owned the one-half of that stock in the meetings of the stockholders, and Peebles was present when the steamboat Bayard was finally authorized to be sold, and was present at the sale and bid on her, and helped to dismantle her.

7. Respondents had no account to render to Gordon, &c.

In September 1861 the stockholders in the Col. Bayard Company were *John E. Shaffer*, James Irwin, Abner Peebles, W. Whigham, Samuel & *Thomas* Clark, J. & W. Whigham, Benjamin Coursin, D. Rhodes, F. Rhodes, F. Houghton, J. Irwin and J. Gordon. Thomas Clark and J. Whigham died and the firm interest survived to their partners; except these changes, the ownership continued as above stated until the transactions which gave rise to this controversy. J. C. Peebles was captain of the steamer.

The stockholders as registered in the James Rees Company on the 7th of August 1863, were A. Peebles, W. Whigham, S. Clark, B. Courson, D. Rhodes, F. Rhodes, F. Houghton, J. Irwin, *J. Walker, S. W. Hendrickson, R. Boyd* and *W. McElroy*. J. C. Peebles was the captain of the "James Rees."

Thomas McConnell, Esq., was appointed master. The master's report, in connection with the testimony taken by the examiner, shows the following facts, which are all that are necessary to an understanding of the case as considered in the opinion of the Supreme Court.

On the 23d of October 1862, a meeting of the Bayard Company was held; Gordon was not present, but he was represented by J. C. Peebles, who then held a proxy to vote on his stock. At this meeting it was unanimously resolved that the secretary should advertise the steamer Col. Bayard for sale; the minimum price was fixed at $1500; if the bids did not reach that price she was to be bid in and a committee, consisting of J. C. Peebles, F. Houghton and B. Coursin, were to take charge of her and dispose of her as they might think best. The boat was accordingly offered for sale at public auction at the Monongahela wharf in Pittsburg, after public notice, but the minimum price not having been reached she was not sold. Gordon had notice of the time and place of sale; about the time she was to be sold he came down to the wharf, but the steamer not having arrived he left. At a subsequent meeting of the company, December 23d 1862, of which Gordon had no notice and at which he was not present, the committee reported the result of the effort to sell and were discharged.

On motion of Coursin, "the secretary was directed to 'auction off' the boat to the highest cash bidder." The boat was put up at that meeting in the presence of stockholders only, and struck off to B. Coursin for $1800. It was then resolved that the company proceed at once to build a new boat, and Peebles, Houghton and Coursin were appointed a committee to contract for the building, &c. It was also resolved that the company take the boat at Coursin's bid of $1800. . On the 27th of December a contract was made by the committee with W. Latta for building the hull of a steamboat, and on the same day the contractor was paid by Coursin $1000, "paid on new hull for B. Coursin & Co." The new hull was to be built for the machinery that was in the Col. Bayard. Shortly after the meeting, December 23d, Gordon was informed "that they had determined to build a new boat, and that the old company had bought in the old boat at $1800." Gordon did not object to the arrangement, but directed that whenever money was wanted, to call on him. At a meeting of the company April 18th 1863 it was resolved that the purchase-money for the Col. Bayard be paid to the treasurer and immediately be paid over by him to the stockholders *pro ratâ*.

Of this meeting Gordon had notice, but was not present. The notice sent to Gordon was signed "by order of the constructing committee." In answer to this notice Gordon acknowledged its receipt as signed "by the constructing committee," saying he would be unable to attend, but would hold himself ready to pay to the committee

29 P. F. SMITH—15

any assessment "you may make at your meeting of stockholders."
On the 18th of April, the day of the meeting, Houghton paid J. E.
Shaffer, the treasurer for the boat, the sum of $1800, the amount
at which it was struck down on the 23d of December 1862.   On
the same day the treasurer credited to each stockholder in the, Col.
Bayard his proportionate share of the $1800; Gordon refused to
receive or have anything to do with the amount credited to him.
Soon after this the breaking up of the Col. Bayard was commenced,
for the purpose of using such parts as would be suitable in con-
structing the James Rees; the original bill in this case was filed
shortly afterwards.

The master decided that "the sale of the boat under the circum-
stances in which it was made was simply void, so far as Gordon
was concerned," and that his interest in the Bayard remained as
before the alleged purchase by Coursin, and found that the ma-
chinery together with all the material of the old boat that could be
used was put into the boat, the hull of which the committee of the
Bayard company had contracted with Latta to build.

After commenting on the testimony somewhat at large he
says :—

"The intention of all the parties at that time I have no doubt
was that the company then existing should build and operate the
new boat under the same rules and regulations that the old boat
was built and operated under, but that any of the old stockholders
who choose might withdraw, and, if deemed advisable, new ones
might be admitted, and that nothing else was thought of until in
the spring, when steamboat stock had gone up largely, some of the
stockholders took it into their heads to turn out the others, and get
the enterprise into their own control.   There is no such thing as
a *new* company mentioned in the resolutions of December 23d
1862.   The meeting was held that day by the company that
owned the old boat, and, I think, no one can read the minutes of
the meeting without coming to the conclusion that it was the same
company that resolved to build the new boat and appointed the
committee to contract for and construct her.   Captain Gordon was
a member of that company; he was recognised as a member of it
up until the 18th of April 1863, and I am not aware that the
other members could drop, him out of it and vest in themselves his
interest in the boat without his consent, and without so much as
notifying him of it, as they attempted to do, and still claim that
they did do.

" I conclude that the company that built and owned the James
Rees was the same company that owned the Col. Bayard, with only
some change in the membership, and perhaps in the name, and
that Captain Gordon was a member of that company; that the
company owned the Col. Bayard at the time she was broken up,
and all of her, that was fit put into the new boat; that Captain

Gordon contributed to the building of the James Rees to the full extent of the value of his interest in the Col. Bayard; that he was entitled to and had a part interest in the James Rees, that bore the same proportion to the whole boat that the amount he contributed to her construction bore to the whole cost of her construction ; and that he is entitled to a like proportionate part of her earnings and of the proceeds of her sale."

The master further found that Gordon owned 25-120ths, not 25-110ths, of the Bayard.

The master then went into a calculation showing the value of the Bayard, the outlay in building the Rees, and the net earnings of the Rees; he found that the plaintiff was entitled to receive from the defendants $2421.16, and reported "in his favor and against the defendants " for that sum, as due on the 20th of January 1871.   Both parties filed exceptions with the master to his report.

The plaintiff's exceptions were : that the master erred in not allowing him 25-110ths of the profits and proceeds of the sale of the steamer James Rees.

The defendants' exceptions were, that the master erred :—

1–5. In finding that the plaintiff had an interest in the James Rees and entitled to receive from defendants $2421.16.

6. In not finding that the project of building a new boat by the Bayard Company fell through, by failure of the stockholders to follow up the resolution of December 23d 1862.

7. In not finding that some of the members of the old company refused to go into the new company, and that this absolved the others from any previous understanding of going into the project of building a new boat.

8–10. In finding that Gordon had any interest in the Bayard when she was broken up, and in valuing her too high.

The master overruled the exceptions, and adhered to his report as first made.

After argument on the exceptions in the Court of Common Pleas the report was confirmed, and the court, June 27th 1874, decreed that the defendants were indebted to the plaintiff in the sum of $2805.73, and that the defendants pay the plaintiff that sum with costs.

Each party appealed to the Supreme Court, and assigned for error respectively, the overruling their exceptions and confirming the report of the master.   The defendants assigned for error also, that the court allowed the plaintiff to file his supplemental bill, changing the cause of complaint, and refusing to strike it off.

*M. W. Acheson*, for defendants.—The title to a ship follows the keel : 2 Kent's Com. 361, 362.   A court of equity will not ordinarily enforce a contract to enter into partnership : Adams Equity 82 ; Measson *v.* Kaine, 13 P. F. Smith 335.

[Coursin's Appeal.]

*D. T. Watson,* for Gordon.

Mr. Justice SHARSWOOD delivered the opinion of the court, October 11th 1875.

It will not be necessary to consider whether the supplemental bill filed without leave of the court ought to have been allowed to stand, as we are of opinion that upon the proofs in the cause, the plaintiff, James Gordon, showed no equity to sustain the decree made below in his favor. The supplemental bill was against the owners of the James Rees, for an account of the profits of that boat, on the ground, either that the plaintiff was a part owner, or that the defendants were trustees for him. In either aspect the bill was defective on the score of the parties. One of the original defendants was John E. Shaffer, who, although a member of the company which owned and ran the Col. Bayard, was not a member of the company which owned and ran the James Rees. He received his share of the proceeds of the Col. Bayard. Whether that be considered as its purchase, or what he agreed to be its value, and he distinctly refused to be interested in the new boat, yet he is decreed along with the other defendants to pay the plaintiff the share of his alleged interest in the profits and proceeds of the James Rees, of which, as far as appears, he never claimed or received a dollar. Four gentlemen are clearly shown to have subscribed to and become interested in the James Rees, who were not interested in the Col. Bayard, who are not parties to this proceeding, and have not been heard; yet if James Gordon was either a part owner or a cestui que trust of the owners of the James Rees, they must contribute their just proportion of the decree. We may pass these objections as, if the justice of the case require it, the cause might be remitted to the court below to have the proceedings amended in these respects.

Let us come to the consideration of the merits of this cause. Was James Gordon to any extent a part owner of the James Rees, entitled to an account of her earnings and proceeds, and to recover any share of them? We may agree with the learned master that the auction sale of the Colonel Bayard of December 23d 1862 to Coursin did not divest the title of James Gordon. The Colonel Bayard, after, as before, remained the property of the original owners. Those of them who acquiesced in that sale, and accepted their share of the price, thereby transferred their interest to Coursin. This they all did except Gordon. He had a right then to object to the dismantling of the old boat, insist upon a fair sale, under the order of a court of equity, and would have been entitled to a decree for an account of the earnings and proceeds, and to recover his share. This was the frame and purport of his original bill, under which, upon the evidence, he is entitled to a decree for an account. But upon what principle of law or equity can it be

maintained that because Coursin, the alleged purchaser of the Colonel Bayard and the actual purchaser of all the shares except Gordon's, by wrongfully taking a part of the machinery of the Colonel Bayard, and using it in the construction of the James Rees, Gordon to the extent of his interest thereby became a part owner in the latter? If a man wrongfully take my lumber, and uses it with his own in the building of his house, does that make me a tenant in common with him? If I could earmark and identify the property, I could follow and seize it, or recover damages in an action of trespass or trover. "If the materials of a person," says Chancellor Kent, "are united to the materials belonging to another, by the labor of the latter, who furnishes the principal materials, the property in the just produce is in the latter, by the right of accession." This rule of the Roman and English law was acknowledged in Merritt *v.* Johnson, 7 Johns. 473; and it has been applied by Molloy to the case of building a vessel. According to the doctrine in the Pandects, if one repairs his vessel with another's materials, the property of the vessel remains in him; but if he builds the vessel from the very keel with the materials of another, the vessel belongs to the owner of the materials—the property is supposed to follow the keel—"*proprietas totius navis carinæ causam sequitur:*" 2 Kent Com. 361–2.

Nor do we think that the contention that the defendants were bound to account to the plaintiff, as trustees, for his share of the Colonel Bayard, can avail to sustain the decree below. Undoubtedly, where there is a confidential relation existing, as that of principal and agent, the principal may compel the agent to account for the profits he has made with his property. Partners are general agents for each other. If one member of a firm, therefore, take the common property and trade with it on his own account, he must answer to his co-partners for all the profits he may make. But part owners of a boat are not partners, but tenants in common. If one tenant in common of a chattel sells it, it is an ouster and conversion, and his co-tenant may follow the chattel in the hands of the purchaser, or may hold the wrongdoer responsible in damages, to the full extent of the value of his interest in the chattel of which he has been deprived. But no one has ever supposed, that I am aware, nor has any authority been cited to show that the proceeds can be followed into any trade or business in which he may invest them, and he be held to account for all his earnings and profits. If there had been such an authority the learned and painstaking master would not have failed to discover it. He has himself cited an authority to show that the owners of the Colonel Bayard were not co-partners as to her ownership, but part owners. The interest of each, therefore, could only be sold by himself or his duly authorized agent: 1 Parsons' Maritime Law 84.

We think, therefore, that the supplemental bill ought to have been dismissed. But inasmuch as we are of the opinion that upon the original bill the plaintiff was entitled to a decree of account as to the Colonel Bayard, and inasmuch as it may be that there may be other accounts, outstanding credits, as well as claims against that boat, we remit the record to the court below, that such decree may be there made and proceeded with according to the course of equity.

> The appeal of James Gordon is dismissed with costs. The decree below is reversed, and the record remitted to the court below for further proceedings: the costs of the appeal of Coursin and others, defendants below, to be paid by the appellee.